**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| OKLAHOMA GAS & ELECTRIC COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| PLUS POWER, LLC, BLACK KETTLE ENERGY STORAGE LLC, and CLYDESDALE OPERATING COMPANY I, LLC, | ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## <u>COMPLAINT</u>

Plaintiff Oklahoma Gas & Electric Company ("OG&E") brings this action against Defendants Plus Power, LLC ("Plus Power"), Black Kettle Energy Storage, LLC (the "Black Kettle Project Company" or the "Project Company"), and Clydesdale Operating Company I, LLC, (the "Plus Power Holding Company"), alleging as follows:

### INTRODUCTION

1.      OG&E is Oklahoma's oldest and largest investor-owned electric utility, serving more than 900,000 households and businesses in Oklahoma and Western Arkansas. In 2024, OG&E engaged in an extensive request-for-proposals (RFP) process, seeking to ensure that it would have sufficient capacity to provide for its customers' growing energy needs. OG&E's RFP explained that successful bidders would need to demonstrate (i) experience and management capability to develop an energy resource, (ii) a viable schedule for achieving commercial operations, and (iii) "financial strength and creditworthiness as a counter-party consistent with the obligations" of the contract contemplated in the bid.

1

2.      Plus Power submitted a bid to provide OG&E with a fixed amount of energy capacity at a fixed price over a twenty-year term (from 2027-2047) from a battery energy storage project Plus Power was developing, which Plus Power called the Black Kettle Energy Storage Project (the "Black Kettle Project" or the "Project"). Plus Power submitted its bid "on behalf of" the Black Kettle Project Company, a shell company that Plus Power had formed for purposes of its development of the Black Kettle Project.

3.      In its bid, Plus Power ███████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████ and

(iii) represented that Plus Power would secure the bid ████████████████

██████ After receiving Plus Power's bid, OG&E asked Plus Power to provide "audited financial statements …. for [the] [b]idder and guarantor, if applicable," noting that "OG&E utilizes that information as part of its determination of which [b]idders advance in the evaluation process." In response, Plus Power █████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████.

4.      Based on Plus Power's representations ████████████████████

███████████████████████████████████████████████

████████████████████████████████████, OG&E

selected Plus Power's bid as one of a small group of successful bids and began negotiating final, formal legal documents.

5.    As the parties engaged in final negotiations during the transition to the current presidential administration, Plus Power expressed concerns about possible policy changes in the new administration, including uncertainty over tariffs. So, at Plus Power's request, OG&E agreed to specific contractual provisions permitting Plus Power and the Black Kettle Project Company to re-negotiate the agreed contract price if—but *only* if—█

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████. Otherwise, Plus Power and the Black Kettle Project Company agreed to provide OG&E the promised energy capacity at the promised price for twenty years or, if they failed to do so, to pay a fee providing OG&E the economic benefit of the promised energy capacity at the promised price over the promised term. Of course, OG&E would not have entered into such a long-term commitment with the Project Company—a shell company with no assets of its own—without Plus Power's promise to

█████████████████████████████████████████████

█████████████. After reaching a long-term, fixed-price energy capacity agreement with Plus Power and the Project Company, OG&E reasonably relied on receiving the promised capacity from the Black Kettle Project at the promised price in its long-term plans to provide for its customers' energy needs at a reasonable, predictable price.  Unfortunately,

Plus Power and its Black Kettle Project Company decided to renege on their agreement, causing substantial damages to OG&E and its customers.

6.      This case arises from the improper actions of Plus Power and its Black Kettle Project Company to repudiate their agreement with OG&E and to attempt to renegotiate the contract energy price—seeking to increase the cost to OG&E by over $200 million—after repeatedly promising to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7.      Not long after reaching an agreement with OG&E, due to changes in the battery energy storage market, Plus Power apparently decided it did not like the deal it had agreed to. So, on October 10, 2025, when President Trump posted a message on the Truth Social app threatening to impose tariffs on exports from China "effective November 1, 2025," "depending on any further actions or changes taken by China," Plus Power seized on this speculative social media posting, implausibly claiming that it somehow ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ entitling Plus Power to renegotiate the parties' agreement and *double* the agreed-upon contract price. But, of course, this off-hand social media post did not "implement" anything, nor did it ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ from Plus Power. Indeed, only days later, on October 30, 2025, President Trump and Chinese President Xi announced an agreement that would *reduce* U.S. tariffs on Chinese goods by 50%. But Plus Power still insisted that it would not go forward unless OG&E agreed to pay more than twice the parties' agreed-upon price.

8.      In further discussions over the next several months, Plus Power continued to insist that it would only go forward if OG&E agreed to a significant price increase. So

OG&E was forced to terminate the parties' agreement and make a claim against Plus Power and the Project Company for its replacement costs, which total $94,428,520, plus interest.

9.      Incredibly, Plus Power responded that "OG&E had no 'dealings' with Plus Power" and that OG&E would have to look only to the Project Company—a shell company with no meaningful assets that Plus Power controlled and formed for purposes of its bid—for payment under the parties' contract. Thus, after inducing OG&E to accept its bid by touting its ███████████████████████████████████████████ ████████████████████████████████ and—in response to OG&E's request for "audited financial statements for … the [b]idder and its guarantors"—providing OG&E with ████ ███████████████████████████████████████████████████████ ██████, Plus Power now disclaims *any* financial obligation under the parties' agreement.

10.     OG&E now brings this action for breach of contract against Plus Power, the Black Kettle Project Company, and the Plus Power Holding Company, and for promissory estoppel against Plus Power and the Plus Power Holding Company, seeking to hold Plus Power and its affiliates responsible for the binding promises they made to OG&E and the many electric customers who rely on it to provide reliable energy at a reasonable price.

## PARTIES, JURISDICTION, AND VENUE

11.     OG&E is an Oklahoma corporation based in Oklahoma City. Formed in 1902, OG&E is Oklahoma's oldest and largest investor-owned electric utility, serving more than 910,000 electric customers in Oklahoma and Western Arkansas.

5

12.     Plus Power is a Delaware limited liability company based in The Woodlands, Texas. Plus Power says that it "develops, owns, and operates utility-scale energy storage facilities that enable a more efficient and reliable electrical grid to support residents and businesses." According to its website, Plus Power currently operates nine utility-scale battery energy storage facilities and has approximately 20 additional facilities in development. Since 2013, Plus Power has been developing a battery energy storage project on approximately 20 acres in Woodward County, Oklahoma, which Plus Power calls the Black Kettle Energy Storage Project.

13.     The Plus Power Holding Company is a Delaware limited liability corporation based out of Plus Power's offices in The Woodlands, Texas. It was formed by Plus Power in 2022. It is wholly-owned by Plus Power ███████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████ .

14.     In connection with its development of the Black Kettle Project, Plus Power formed a shell company, the Black Kettle Project Company. The Black Kettle Project Company is a Delaware limited liability company. It is based out of Plus Power's offices in The Woodlands, Texas. Plus Power owns ████████████ of the Project Company's equity. Upon information and belief, the Project Company has no employees and no assets. Its activities are entirely directed by Plus Power and it acts only through Plus Power employees. Its officers are Plus Power employees. Upon information and belief, all of the

Black Kettle Project's assets—including the land on which it is to be built—████████ ██████████████████████████████████████████.

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this civil action is between citizens of different states and the amount in controversy exceeds $75,000.00.

16.    The Court has personal jurisdiction over Plus Power, the Black Kettle Project Company, and the Plus Power Holding Company because this action directly relates to their activities in Oklahoma, including developing an energy project in Oklahoma and bidding, and contracting, to provide energy capacity to an Oklahoma utility. In addition, Plus Power and its affiliates have consented to personal jurisdiction under the forum selection clause of the May 16, 2025 Capacity Purchase Agreement between OG&E and the Black Kettle Project Company ("Agreement"), which provides that any dispute arising under the Agreement shall be subject to the "exclusive jurisdiction and venue of the United States District Court for the Western District of Oklahoma, located in Oklahoma County, Oklahoma."

17.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because the Agreement designates this forum as the "exclusive jurisdiction and venue" for any dispute and because a substantial part of the events giving rise to OG&E's claims occurred in this district.

## GENERAL ALLEGATIONS

### A. OG&E's Growing Energy Capacity Requirements as an SPP Member and a Regulated Utility.

18. To meet its customers' energy needs, OG&E generates its own power and purchases energy and capacity from others, including traditional resources (like natural gas and coal energy generation facilities) and renewable resources (like wind farms, solar farms, and energy storage).

19. OG&E is a member and participant in the Southwest Power Pool ("SPP"), one of six major regional transmission organizations created by the Federal Energy Regulatory Commission to manage the electric grid, ensure reliability, and operate wholesale electricity markets across large multi-state regions. As a regional transmission organization, the SPP establishes "load capacity requirements" to ensure that it has sufficient energy capacity to meet projected peak demand (plus some additional margin). As an SPP member, OG&E must meet its assigned share of the SPP load capacity requirements. If OG&E fails to meet its capacity requirements, it must pay the pool a "Deficiency Payment" to compensate other participants for the shortfall.

20. OG&E is also regulated by both the Oklahoma Corporation Commission (the "Oklahoma Commission") and the Arkansas Public Service Commission (the "Arkansas Commission"), which oversee OG&E's prices and service reliability and must approve certain projects and contracts. At least every three years, OG&E must present an "Integrated Resource Plan" to both Commissions, describing how it intends to meet its customers' projected energy needs.

21.    OG&E prepared an Integrated Resource Plan in 2024 (the "2024 Plan"). In preparing the 2024 Plan, OG&E determined that its capacity needs had grown significantly—and would continue to grow in the future—due to increased SPP capacity requirements and load growth in OG&E's service area. Specifically, as reflected in the 2024 Plan, OG&E projected that it would need additional capacity of approximately 1,200 megawatts—enough energy to power more than 200,000 homes—by 2030.

**B. OG&E Issues an "All-Source" Request for Proposals to Help Meet Its Increased Projected Capacity Requirements.**

22.    To meet the anticipated energy capacity needs reflected in the 2024 Plan, OG&E issued an "All-Source Request For Proposals" (the "2024 RFP") on May 31, 2024, seeking bids for energy and energy capacity products.

23.    An "all-source" RFP is not limited to any specific type of technology, fuel source, generation location, or contract type. The 2024 RFP invited bidders to offer a variety of contracting structures—including purchase and sale agreements ("PSAs"), power purchase agreements ("PPAs"), and capacity purchase agreements ("CPAs")—from all SPP-accredited generation technologies, including traditional and renewable solutions.[1] The RFP also provided potential bidders with a form PSA, PPA, and CPA, each providing the basis for negotiation of final agreements with successful bidders.

---

[1] In a PSA, a project developer sells an energy project to an energy consumer, like OG&E. In a PPA, the operator of an energy project agrees to sell power to an energy consumer like OG&E at a fixed rate. In a CPA, the operator of an energy project agrees to supply a fixed amount of energy capacity at a fixed rate, which the consumer pays regardless of the amount of energy actually used.

24.     The 2024 RFP described in detail the RFP process, the requirements for proposals, and the criteria by which bids would be evaluated.

25.     The 2024 RFP's Requirements for Proposals.  The RFP requested bids for long-term PPAs and CPAs to help meet OG&E's growing long-term capacity needs while locking-in prices.

26.     To bid in the RFP, bidders were required to submit "Bid Narratives" with information about their bids organized under 12 headings: "Summary of Bid;" "Operations and Maintenance Plan;" "Risk Mitigation Plan;" "Ownership/Financing Summary;" "Impact on Local Economic Conditions;" "Impact on Environmental Conditions;" "Siting, Permitting and Fuel Delivery Plan;" "Interconnection Plan;" "Schedule;" "Project Organization and Management;" "Ownership/Development Experience;" and a "Summary of Any Changes Sought to the Form Agreement."

27.     The RFP explained that the Ownership/Financing Summary should "[i]nclude a detailed discussion of the [p]roject's proposed financing plan to demonstrate reasonable ability to finance the proposed [p]roject." In addition, the RFP provided that, "[i]f [the] [b]idder is relying on a guarantor for credit support, the financing plan should describe the corporate relationship between [the] [b]idder and guarantor" and, if the proposed project was relying on financing "from [the] [b]idder's parent company or corporate affiliate, the funding source at the parent or affiliate level (e.g., cash in hand, debt, new equity) should be described."

28.    With respect to Ownership/Development Experience, the RFP explained that, for new projects, "[b]idders [were] required to demonstrate experience and capability to successfully develop the Project as proposed" and that "OG&E [was] particularly interested in a team which has demonstrated success with [g]eneration [f]acilities of a similar technology, size, operational use, and location." The RFP also required bids to "[p]rovide brief profiles of at least one and no more than three similar Generation Facilities the Bidder has successfully developed to Commercial Operation."

29.    With respect to the Schedule, the RFP required "[c]apacity be available . . . no later than May 1, 2030, with a preference for [p]rojects to provide [c]apacity to OG&E as early as possible."

30.    In addition to the Bid Narrative, the RFP required bidders to provide "[a]udited financial statements for the last three years for [the] [b]idder and guarantor (if applicable)."

31.    Bid Evaluation Criteria. The RFP explained that bids would first be subject to a "Threshold Evaluation," in which OG&E would "review each [b]id to determine whether it satisfies the threshold criteria of compliance, completeness, technical viability, and [b]idder financial capability." With respect to "[b]idder financial capability," to advance past the initial threshold evaluation, bidders were required to "demonstrate financial strength and credit worthiness as a counter-party consistent with obligations of the pertinent [c]ontract [t]ype."

11

32.     Those bids that passed the initial threshold evaluation would then be evaluated based on certain "non-price (qualitative) evaluation criteria" and "price (quantitative) evaluation criteria." The qualitative criteria included (i) contract risks, costs, and benefits; (ii) overall project characteristics and risks; and (iii) community and environmental impacts. The quantitative evaluation would assess bids through "simulation of the impact of the [b]id on the costs paid by OG&E's customers."

33.     The RFP explained that "contract risks, costs, and benefits" would be assessed based on the extent to which pricing was firm and without dependencies or contingencies, and the extent to which cost containment measures effectively limited cost risk for OG&E customers.

34.     The RFP explained that, as to "overall project characteristics and risks," each project would be assessed for its "technical characteristics and expected operational performance and safety." Bidder experience, the project schedule, and financing capability were key factors in this assessment. The RFP explained that, for all new projects, "[b]idders [were] required to demonstrate experience and management capability to successfully develop and finance the Project." As for the schedule, the RFP explained that OG&E "ha[d] a strong preference for [p]rojects with earlier Capacity Availability Dates (i.e. first delivery of Project Capacity to OG&E)." And, as for financing capability, the RFP required bidders to "demonstrate their ability to finance development of the [p]roject so it can reach Commercial Operation."

### C. Plus Power Submits a Bid to Provide Capacity from Its Black Kettle Project.

35.    On September 25, 2024, Plus Power submitted a bid to provide energy storage capacity from the Black Kettle Project (the "Plus Power Bid"). The Plus Power Bid proposed construction of a battery energy storage system ("BESS") on the 20-acre Black Kettle site in Woodward County.



36.    Plus Power maintains blackkettleenergystorage.com, a website for the Black Kettle Project. The website explains that "Plus Power has been developing the Black Kettle Energy Storage facility" and that "[t]he Plus Power team" chose "the project location for Black Kettle." As the website explains, Plus Power chose the project location because it

was strategically positioned for interconnection with OG&E's transmission system at OG&E's Woodward 345kV substation.[2]

37.    The Plus Power Bid stated that it was submitted ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████. For

example:

- When describing the "Bidder Performance History," the Plus Power Bid represented that ███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████.

- When describing the Project's "Major Warranties," the Plus Power Bid represented that ███████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████.

- When describing the bidder's "Risk Mitigation Plan," the Plus Power Bid represented  that  ████████████████████████████████████ ████████████████████████████████████████████████████████; that ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████; and that ██████████

---

[2] *See* https://www.blackkettleenergystorage.com/overview. Plus Power's Black Kettle Project website also includes a "News" page with links to news reports about Plus Power projects across the country and invites readers to "contact us" at blackkettle@pluspower.com. *See* https://www.blackkettleenergystorage.com/news. The Black Kettle Project website does not mention Black Kettle Energy Storage, LLC (i.e. the Project Company).

██████████████████████████████████████████████████████████
████████████████████████████████

- In its "Ownership/Financing Summary," the Plus Power Bid explained that ████████████████████████████████████████████████████ ████████████████████████████, that █████████████████████████████████ ████████████████████████████████████████████████████ and that ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████

- When describing the Project's "Impact on Local Economic Conditions," the Plus Power Bid represented that ███████████████████████████████ ███████████████████████, that ███████████████████████████████ ██████████████████████████████████, that █████████████████ ████████████████████████████████, and that ████████████████ ██████████████████████████████████████████

- When describing the "Schedule," the Plus Power Bid █████████████ ████████████████████████████████████████████████████ █████████████████████████████████. The Plus Power Bid also represented that █████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████

- When describing the "Project Organization and Management," the Plus Power Bid represented that ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ and that █████████████████ ████████████████████████████████████████████████████ ██████████████████ █████████████████████████████ ██████ ████████████████████████████████████████████████████ ███████████████████

- When describing "Ownership/Development Experience," the Plus Power Bid represented that ████████████████████████████████████████ ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████
████████████████████████████████

38.    The Plus Power Bid did not attach "[a]udited financial statements . . . for [the] [b]idder and guarantor," as the RFP required, stating instead that ███████████████████████

██████████████████████████████████████

39.    After receiving the Plus Power Bid, OG&E contacted Plus Power to request the required audited financial statements for the "[b]idder and guarantor," explaining that "[f]inancial statements [were] a required component for Bid submission" and highlighting that "OG&E utilizes that information as part of its determination of which [b]idders advance in the evaluation process." In response, Plus Power employee Marcus Weathersby sent ██████████████████████████████████████

████████████████████████████████████████████████████████████████

██████ According to ████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████.

40.    Thus, in connection with the Plus Power Bid, Plus Power expressly represented to OG&E that it would provide ████████████████████████████████

█████████████████████ that it was ██████████████████████████████████

███████████████████████████████████████████████████████████

████████████████ and that it had ████████████████████████████████████

███████████.

16

41.    OG&E's Bid Evaluation Process. By the close of the bidding period, OG&E received a total of 200 bids in response to the 2024 RFP. As described in the RFP, OG&E first conducted the threshold evaluation to determine whether the bids conformed to the RFP's requirements, including "demonstrat[ing] financial strength and credit worthiness as a counter-party." Ninety-three bids—including the Plus Power Bid—passed the threshold evaluation and advanced to the qualitative and quantitative evaluations. At the conclusion of the qualitative and quantitative evaluations, the Plus Power Bid for a 95 megawatt CPA was the third-highest-scoring bid.

42.    The Plus Power Bid was attractive to OG&E—and scored well in the RFP—for several reasons.

43.    First, a long-term contract for energy storage capacity from a BESS project like Black Kettle provided an opportunity for OG&E to expand its renewable resource portfolio.

44.    Second, Plus Power said that it expected to ███████████████████ ████████████████████████████████████████████ ███████████████████████. Indeed, the Plus Power Bid offered the earliest available capacity among all conforming bids. Plus Power represented that it could meet this timeline because it had already ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████ This projected construction timeline—and the potential for the Project to

provide energy storage capacity by the summer of 2027—was a significant selling point for OG&E.

45.     Third, Plus Power's extensive experience developing renewable energy projects, Plus Power's significant financial resources, and the fact that Plus Power had ██████████████████████████████████████████████ ████████████████████████████████████████ were highly attractive.

46.     Fourth, OG&E concluded that the Plus Power Bid's fixed price over a 20-year term would provide capacity certainty for a long period at a known cost. As the RFP made clear, OG&E was seeking a variety of different project structures that would provide a "firm price" and "effectively limit cost risk for OG&E customers." Thus, Plus Power's promise to ███████████████ under a long-term CPA was attractive as part of the portfolio of projects to meet OG&E's future capacity requirements.

47.     Ultimately, OG&E selected the Plus Power Bid as one of seven successful bids invited to negotiate a formal agreement (in the case of Plus Power, a CPA) with OG&E. On February 21, 2025, OG&E notified Plus Power that the Plus Power Bid had been selected for further negotiation.

48.     After Plus Power confirmed that it wished to go forward, over the next three months, OG&E and Plus Power engaged in commercial and legal negotiations over a final, formal agreement. Plus Power employees (including Plus Power Chief Commercial Officer Brian Duncan, Plus Power Senior Vice President Vijay Singh, and Plus Power Manager, Origination & Commercial Marcus Weathersby) conducted these negotiations on behalf of

18

the Black Kettle Project. All written communications with these Plus Power executives were conducted through their respective Plus Power email addresses. The Plus Power executives' written communications included signature blocks identifying their positions at Plus Power. Upon information and belief, neither Mr. Singh nor Mr. Weathersby are employees or officers of the Black Kettle Project Company, and, while Mr. Duncan purportedly serves as an officer of the Project Company in addition to his role at Plus Power, on information and belief, he is paid by Plus Power.

### D. The Black Kettle Project Capacity Purchase Agreement.

49. On May 16, 2025, OG&E entered into the Black Kettle Project Capacity Purchase Agreement with Plus Power's Black Kettle Project Company, which was largely based on OG&E's form CPA agreement that had been provided to bidders in the RFP process.[3] Under the Agreement, all communications with the Black Kettle Project Company were to be sent to ████████████████████████ and ████████████████.

50. Under the Agreement, OG&E agreed to purchase—and Plus Power's Black Kettle Project Company agreed to provide—95 megawatts per month of ████████ ████████████ eligible to be credited to OG&E's SPP requirements, for a fixed price of ████████████ during the summer and winter seasons from 2027 through 2047.

---

[3] The Black Kettle Project Capacity Purchase Agreement comprises a constellation of contract documents: a 2002 ISDA Master Agreement ("Master Agreement"), the Schedule to the Master Agreement (the "Schedule"), which incorporates the ISDA North American Power Annex ("Power Annex), and the Capacity Purchase and Sale Confirmation ("Confirmation").

51.   The Agreement identified certain events of default— ████████████

██████████████████████████████████████████████████████████

████████ . And, if an event of default occurred, the Agreement allowed the non-defaulting

party ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████ In short, Plus

Power agreed that, if it repudiated the Agreement and disclaimed its obligation to provide

the promised capacity at the promised fixed price over the promised 20-year term, OG&E

would be entitled to recover the economic benefit of the promised capacity at the promised

fixed price of the promised term.

52.   The Agreement also requires a defaulting party to ████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████t.

53.   Together, both (i) the Agreement's fixed price over a twenty-year term and

(ii) OG&E's contractual right to recover the cost to replace the promised capacity if the

Black Kettle Project failed to deliver it, provided OG&E with ████████████████

████████████████████████████████████████ . As Plus Power knew,

OG&E would only have entered into such a long-term agreement with a bidder that had

"demonstrate[d] [the] financial strength" necessary to perform "as a counter-party

20

consistent with obligations of the [Agreement]," including the obligation to provide OG&E with the economic equivalent of the promised capacity at the promised fixed price over the promised 20-year term in an event of default.

54.    Knowing that OG&E would only consider entering into an agreement with a bidder that had demonstrated such "financial strength," Plus Power represented that it was

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████. As Plus Power intended, OG&E relied on these representations when deciding to advance the Power Plus Bid and, ultimately, to enter into the Agreement.

55.    While OG&E's form CPA was the starting point for negotiations, the Agreement included one significant departure from OG&E's form. In the months since Plus Power submitted its bid, due in part to the results of the 2024 presidential election and the change in administration, significant uncertainty had arisen in the market regarding potential tariff increases and the continued availability of investment tax credits for renewable energy projects. To address this uncertainty, Plus Power requested—and OG&E agreed to—specific contractual provisions that would allow Plus Power to renegotiate the price and, potentially, to walk away from the deal under certain specifically defined circumstances.

56.    With respect to potential tariff increases, the parties agreed that Plus Power would have certain rights ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████. ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

57.    Thus, to address the uncertainty over potential increases in tariffs and other matters, the parties agreed that Plus Power would have the ability to walk away from the Agreement if, and only if, it could show that ████████████████████████████

███████████████████████████████████████████████████████

████████████████████████ Otherwise, Plus Power and the Black Kettle Project Company would be required to provide the promised capacity at the promised price for the promised fixed term or, if it failed to do so, ████████████████████████████

████

**E. OG&E Acts in Reliance on the Black Kettle Project Capacity Purchase Agreement.**

58.     After the parties executed the Agreement, OG&E reasonably relied on receiving the promised 95 megawatts of monthly energy capacity from the Black Kettle Project during the high-demand summer and winter months over the 20-year contract term. Accordingly, in its long-range planning (including in preparing an updated 2025 Integrated Resource Plan for the Oklahoma and Arkansas Corporation Commissions), OG&E reasonably assumed that the Black Kettle Project would provide the promised 95 mega watts of monthly capacity for the 20-year contract term. As a result, OG&E forewent further negotiations with other potential bidders who were prepared to provide the promised capacity and otherwise refrained from taking steps necessary to obtain the capacity promised by the Black Kettle Project.

59.     After the parties signed the Agreement, OG&E worked for months to obtain the required regulatory approval of the Agreement from the Oklahoma and Arkansas Commissions. In its regulatory submissions, OG&E represented to its primary regulators that the Agreement would provide the promised benefits to OG&E and its customers. The Oklahoma Commission ultimately approved the Agreement on November 13, 2025 and the Arkansas Commission on January 23, 2026.

**F. Plus Power Has Second Thoughts and Purports to Invoke the "Change in Market Structure" Provision as a Pretext to Repudiate the Parties' Agreement.**

60.     Between May 2025 and October 2025, due to developments in the renewable energy market—including reduced volatility in energy prices—Plus Power began to

23

express concerns about the profitability of the Project. When energy prices are volatile, battery energy storage projects like the Black Kettle Project can profit from changes in prices if they can purchase energy to charge their batteries when prices are low and then sell the energy when prices are high. Plus Power explained to OG&E that reduced volatility in energy prices had changed the economics of the Project such that Plus Power could no longer finance it on profitable terms. In short, Plus Power decided it was not going to make enough money off of the Project. Over the summer of 2025, Plus Power executives asked OG&E to consider various changes to the Agreement. But OG&E explained that—having selected the Plus Power Bid in a competitive public RFP process based on its key terms, reached a binding Agreement reflecting those key terms after months of negotiations, and presented the Agreement to its regulators for approval—OG&E could not agree to material changes in the Agreement.

61.    Then Plus Power believed it saw a chance to impose higher prices on OG&E or to walk away from the Agreement entirely. On October 9, 2025, China announced that it would be imposing export controls on rare earth elements and related products, equipment, and technologies, effective November 1, 2025. The next day, President Trump posted a response on the social media website Truth Social:

> "It has just been learned that China has taken an extraordinarily aggressive position on Trade in sending an extremely hostile letter to the World, stating that they were going to, effective November 1st, 2025, impose large scale Export Controls on virtually every product they make, and some not even made by them. . . . Based on the fact that China has taken this unprecedented position, and speaking only for the U.S.A., and not other Nations who were similarly threatened, starting November 1st, 2025 (or sooner, depending on

any further actions or changes taken by China), the United States of America will impose a Tariff of 100% on China, over and above any Tariff that they are currently paying. . . . It is impossible to believe that China would have taken such an action, but they have, and the rest is History. Thank you for your attention to this matter!"[4]

62.    President Trump's social media posting—threatening to impose new tariffs in the future "depending on … further" events—did not ██████████████████ ██████████████████████████████. But Plus Power—already unhappy with the economics of the deal—seized on this posting as a pretext to renege on the Agreement. On October 14, 2025, Plus Power Chief Commercial Officer Brian Duncan emailed to OG&E (from his Plus Power email address) a letter, in which Plus Power asserted that President Trump's social media post ██████████████████ ██████████████████████████████. Based on this supposed newly implemented law, Plus Power asserted that it was entitled to an adjusted price of ████████████—more than *double* the ██████████ contract price— effectively demanding that OG&E pay an additional $200 million over the life of the Agreement.

63.    OG&E responded on October 17, 2025, explaining that Plus Power's letter was not a valid Contract Price Adjustment Notice because President Trump's social media post did not ████████████████████ and because Plus Power had not shown that the post would ████████████████████████████

---

[4] https://truthsocial.com/@realDonaldTrump/posts/115351840469973590

██████████ Nonetheless, OG&E agreed to meet with Plus Power to discuss its concerns about the uncertainty of potential future implementation of tariffs on Chinese goods.

64.    On October 20, 2025, Mr. Duncan sent another letter to OG&E (again from his Plus Power email address), again asserting that President Trump's Post had ████████████████████████████████████████████████ OG&E again responded that no tariff had been implemented and Plus Power had not shown that the Truth Social post would ███████████████████████████████ ██████████

65.    On October 27, 2025, Plus Power Senior Vice President Vijay Singh—who was not an officer or employee of the Project Company—sent OG&E a purported Notice of Termination (from his Plus Power email address), asserting that Plus Power was entitled to terminate the Agreement because OG&E failed to meet and negotiate within ████████ ████████████████████████████████████

66.    On October 30, 2025, President Trump and Chinese President Xi Jinping met and announced an agreement under which China would withdraw the export controls planned for November 1 and the United States would *reduce* tariffs on Chinese goods by 50%. Thus, the potential tariff increase referred to in the Truth Social post was never implemented, confirming that the Truth Social post could not possibly have qualified as a ███████████████████████████████████████ and that Plus Power's purported termination was invalid.

67.     Following the October 30, 2025 announcement that tariffs on Chinese goods would be *reduced*, OG&E and Plus Power met on multiple occasions. But—even after it became clear that no increased tariffs would be implemented—Plus Power continued to insist that OG&E agree to an increased contract price, requiring OG&E to pay Plus Power an additional *$200 million* above the Agreement's contract price.

68.     In explaining its desire to renegotiate the Agreement, Plus Power executives explained that market developments in the battery energy storage industry had led to reduced revenues, which had negatively affected the financing market, noting recent reports of reduced revenues for battery energy storage projects in the Texas energy market.[5] Thus, Plus Power made clear its decision to renege on the Agreement was *not* about increased costs due to tariffs. Plus Power simply decided the Project was not profitable enough, so it tried to increase the price to OG&E—and, ultimately, to Oklahoma and Arkansas families and businesses—by *more than $200 million*.

### G. In Response to Plus Power's Repudiation, OG&E is Forced to Terminate the Parties' Agreement.

69.     Plus Power's repeated repudiation of its contractual obligations constituted a default under the Agreement, entitling OG&E to terminate the Agreement and collect a substantial Early Termination Fee. Before terminating the Agreement, however, OG&E

---

[5]     *See* https://www.enverus.com/newsroom/ercot-battery-profits-drop-as-market-saturation-reshapes-texas-storage/ (November 2025 study showing that "[a]verage annual revenue for batteries in [the Texas energy market] has dropped sharply from $149 per kilowatt in 2023 to just $17 per kilowatt projected for 2025" and that "saturation" in the battery energy storage market was "driv[ing] down profitability").

engaged in months of discussions with Plus Power seeking to save the Agreement. But, once it became clear that Plus Power would not honor its promises and would not go forward unless OG&E agreed to increase the contract price by *over $200 million*, OG&E was forced to exercise its right to terminate the Agreement.

70.    On January 20, 2026, OG&E sent Plus Power and the Black Kettle Project Company a "Notice of Termination," advising them that their actions to repudiate the Agreement constituted a default and designating February 3, 2026, as the Early Termination Date.

71.    On January 27, 2026, Plus Power's Brian Duncan responded to OG&E's Notice of Termination by asserting that Plus Power could have no liability under the Agreement because only OG&E and the Black Kettle Project Company were parties. Incredibly, after Plus Power submitted the Plus Power Bid touting ███████████ ████████████████████████████████████████████ represented that it would ██████████ ██████████████████████████████; provided OG&E with the ███████ ████████████████████████████████████████████████ █████████; and negotiated the terms of the Agreement with OG&E, Mr. Duncan wrote (from his Plus Power email address) that "OG&E had no 'dealings' with Plus Power."

72.    On February 18, 2026, OG&E sent Plus Power and the Black Kettle Project Company an Early Termination Statement setting forth OG&E's calculation of the Close-out Amount due from Plus Power and the Black Kettle Project Company. Due to the

28

continued increase in energy capacity prices since the parties executed the Agreement, OG&E calculated that the additional cost above the promised fixed price to replace the promised capacity was $94,428,520 (plus interest compounding daily from the Early Termination Date).[6] This does not include the significant cost and burden of conducting a new RFP process, negotiating a new agreement for replacement capacity, and obtaining regulatory approval for a replacement agreement.

73.     The Early Termination Amount was due upon receipt of the Early Termination Statement. Neither Plus Power nor the Black Kettle Project Company has paid the Early Termination Amount.

## H. Plus Power's Domination of the Black Kettle Project Company

74.     Plus Power formed the Black Kettle Project Company as a shell company in connection with Plus Power's development of the Black Kettle Project. Plus Power completely controlled and dominated the Project Company's operations, such that the Project Company merely acted as a façade for Plus Power.

75.     The Project Company was not adequately capitalized to develop the Project or to perform under the Agreement. Indeed, upon information and belief, █████████

---

[6] The Early Termination Amount consists of █████████████████████████████████████████████████████████████████████████████████████████. OG&E calculated the Close-out Amount by ███████████████████████████████████████████████████████████████████████████████████.

██████████████ . ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████ .

Because, upon information and belief, ███████████ , the Project Company is necessarily insolvent. It cannot meet obligations as they come due in the ordinary course of business. Instead, upon information and belief, the Project Company relies entirely on Plus Power to meet its obligations.

76.    Plus Power and the Project Company operated as a single economic entity. And Plus Power held them out as a single economic entity in its dealings with OG&E. Among other things, knowing that OG&E would only entertain bids from bidders that "demonstrate[d] financial strength and credit worthiness as a counter-party," Plus Power represented to OG&E that it would provide █████████████████████████████████

████████████████ that it was ████████████ ██████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████ In addition, in response to OG&E's requests for audited financial statements of "the [b]idder and its guarantors" to be used "as part of its determination of which Bidders advance in the evaluation process," Plus Power submitted ████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

█████████████████ .

77.    Upon information and belief, the Project Company does not observe corporate formalities. The Project Company is headquartered at Plus Power's offices in

The Woodlands, Texas. Upon information and belief, the Project Company has no employees. The Project Company acts only through its officers who are all Plus Power employees paid only by Plus Power. For example, communications and notices to the Project Company under the Agreement are to be sent to ██████████████████ and ████████████████ and the Black Kettle Project website invites readers to "contact us" at blackkettle@pluspower.com. In addition, all OG&E's communications with the Black Kettle Project Company were with Plus Power officers and employees, including Plus Power Senior Vice President Vijay Singh, Plus Power Chief Commercial Officer Brian Duncan, and Plus Power Manager, Origination and Commercial Marcus Weathersby, who all communicated with OG&E exclusively through their Plus Power email addresses.

78.    Plus Power controlled and dominated the Project Company's actions in connection with the Agreement. Plus Power prepared the Plus Power Bid. Plus Power conducted all negotiations with OG&E over the terms of the Agreement. Plus Power managed and directed the Black Kettle Project Company's performance and actions under the Agreement. Plus Power controlled the Project Company's actions in repudiating its obligations under the Agreement, by improperly claiming that President Trump's social media post constituted a ██████████████████████████████. And Plus Power controlled the Project Company's actions in breaching the Agreement by failing to pay to OG&E the Early Termination Amount to which it is entitled under the Agreement.

## COUNT I: BREACH OF CONTRACT
### (Against Black Kettle Energy Storage LLC)

79. OG&E repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

80. OG&E and the Black Kettle Project Company entered into a binding and enforceable Capacity Storage Agreement on May 16, 2025.

81. OG&E complied with all material terms and performed all its material obligations under the Agreement.

82. The Black Kettle Project Company defaulted under the Agreement by disclaiming its obligation to provide power capacity to OG&E at the contractually agreed terms and by attempting to unilaterally terminate the Agreement.

83. In response to this default, OG&E served on the Black Kettle Project Company a valid Early Termination Notice and a valid Early Termination Statement setting forth the Early Termination Amount owed by the Black Kettle Project Company.

84. The Black Kettle Project Company breached the Agreement by failing to pay the Early Termination Amount.

85. As a result of the Black Kettle Project Company's defaults and breaches of the Agreement, OG&E has suffered no less than $94,428,520 in damages, exclusive of interest.

86. In addition, the Black Kettle Project Company is obligated to indemnify OG&E for all reasonable out-of-pocket expenses, including attorneys' fees, incurred by

32

OG&E in exercising its right to terminate the Agreement and in enforcing and protecting its rights under the Agreement following the Black Kettle Project Company's default.

87.     For these reasons, OG&E is entitled to judgment against the Black Kettle Project Company for damages in an amount to be determined at trial.

## COUNT II: BREACH OF CONTRACT
### (Against Plus Power LLC and Clydesdale Operating Company I, LLC)

88.     OG&E repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

89.     OG&E and the Black Kettle Project Company entered into a binding and enforceable Capacity Storage Agreement on May 16, 2025.

90.     OG&E complied with all material terms and performed all its material obligations provided in the Agreement.

91.     By its conduct, Plus Power, which formed the Black Kettle Project Company as a shell company and owned substantially all of its equity, manifested an intent to be bound by the Agreement and assume the obligations thereunder, including by committing to ██████████████████████████████████████████████████████ ████████████████████████████████.

92.     Specifically, Plus Power: (i) submitted the Plus Power Bid, in which it touted ████████████████████████████████████████████████████████ ████████████████, and its purported ███████████████████████ ████████████████████████████████████████████████; (ii) in response to OG&E's requests for audited financial statements of "the [b]idder and its guarantors" to be

used "as part of its determination of which [b]idders advance in the evaluation process," submitted ████████████████████████████████████████ ███████████████████; (iii) negotiated the terms of the Agreement with OG&E; and (iv) managed and directed the Black Kettle Project Company's performance and actions under the Agreement.

93.    Alternatively, the Court should pierce the corporate veil to hold Plus Power liable under the Agreement and to satisfy its contractual obligations with assets on the balance sheet of its wholly-owned subsidiary, the Plus Power Holding Company.

94.    Plus Power exercised complete domination of the Black Kettle Project Company, including with respect to the Plus Power Bid and the Agreement, and used that domination to commit a wrong against OG&E, resulting in OG&E's injury.

95.    The Project Company had no meaningful legal or economic existence distinct from Plus Power. Upon information and belief, the Project Company failed to observe corporate formalities. Its headquarters was Plus Power's office in The Woodlands, Texas. The Project Company had no employees of its own. It acted only through Plus Power employees. Upon information and belief, the Project Company has no bank account and no assets, and, thus, is undercapitalized, and insolvent. Upon information and belief, Plus Power holds the assets of the Project—including the land on which the Project was to be built—through another subsidiary, effectively stripping the Project Company of any assets with which to meet its obligations, including its obligations under the Agreement. In addition, the Black Kettle Project Company was so dominated by Plus Power and its

separate entity so ignored that it primarily transacted Plus Power's business and should be treated as Plus Power's alter ego.

96.    Plus Power defaulted under the Agreement by disclaiming its obligation to provide power capacity to OG&E at the contractually agreed terms and by attempting to unilaterally terminate the Agreement.

97.    In response to this default, OG&E served on Plus Power a valid Early Termination Notice and a valid Early Termination Statement setting forth the Early Termination Amount owed by Plus Power.

98.    Plus Power breached the Agreement by failing to pay the Early Termination Amount.

99.    As a result of Plus Power's defaults and breaches of the Agreement, OG&E has suffered no less than $94,428,520 in damages, exclusive of interest.

100.    In addition, Plus Power is obligated to indemnify OG&E for all reasonable out-of-pocket expenses, including attorneys' fees, incurred by OG&E in exercising its right to terminate the Agreement and in enforcing and protecting its rights under the Agreement following Plus Power's default.

101.    For these reasons, OG&E has been damaged and is entitled to judgment against Plus Power for damages in an amount to be determined at trial.

## COUNT III: PROMISSORY ESTOPPEL
### (Against Plus Power, LLC and Clydesdale Operating Company I, LLC)

102.    OG&E repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

35

103.    OG&E's RFP sought long-term agreements for energy and energy capacity to meet the expanding needs of its consumers and the SPP. As the RFP explained, OG&E assessed competing bids based, among other things, on the respective bidder's "financial strength and creditworthiness as a counter-party." In response, Plus Power submitted the Plus Power Bid.

104.    The Plus Power Bid promised OG&E 95 megawatts of energy capacity per month during the winter and summer months over a twenty-year term. Plus Power promoted the reliability and price stability of its bid by, among other statements and actions: (i) providing ██████████████████████████████████████████████, to demonstrate the availability of adequate financial resources to achieve commercial operation of the Black Kettle Project; (ii) promising to secure the deal with ████████ ████████████████████████████████; (iii) representing that ████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████ ; (v) representing that ██████████████████████████ ██████████████████████████████████████████████ ████████████████████████████ ; and (vi) promising that ██████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████ .

105.   OG&E reasonably and foreseeably relied on these promises—including promises that Plus Power would use assets on the Holding Company's balance sheet to support the bid—to conclude that the Plus Power Bid and the Black Kettle Project offered a reliable route to enhancing energy capacity at stable prices over a long period. On that basis, OG&E selected the Plus Power Bid and entered into the Agreement, foregoing available alternative bids.

106.   OG&E was injured by relying on Plus Power's promises. Absent Plus Power's promises, OG&E would not have sustained the financial harm pleaded above.

107.   For these reasons, OG&E has been damaged and is entitled to judgment against Plus Power for damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

OG&E respectfully requests that this Court:

a.   Declare that Plus Power is bound by the Agreement;

b.   Declare that Plus Power and the Black Kettle Project Company have breached the Agreement and are in default;

c.   Enter judgment in OG&E's favor against Plus Power and the Black Kettle Project Company for their breaches of the Agreement;

d.   Alternatively, in the event that the Court finds that Plus Power is not bound by the Agreement, enter judgment in OG&E's favor against Plus Power for promissory estoppel;

37

e.   Award OG&E damages in a precise amount to be determined at trial, but in no event less than $94,428,520, plus interest at the agreed rate of 8.3% per-annum compounding daily from the Early Termination Date;

f.   Award OG&E its costs of suit and attorneys' fees pursuant to the Agreement's indemnification clause; and

g.   Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

s/*Anthony Hendricks*

Anthony Hendricks, OBA #31083
Jaycee Simon, OBA #34432
**CROWE & DUNLEVY**
A Professional Corporation
Braniff Building
324 N. Robinson Ave., Suite 100
Oklahoma City, OK 73102-8273
(405) 235-7700
(405) 239-6651 (Facsimile)
anthony.hendricks@crowedunlevy.com
jaycee.simon@crowedunlevy.com

-AND-

James J. Beha II (*pro hac vice* forthcoming)
Eric DuPont (*pro hac vice* forthcoming)
Christina Romak (*pro hac vice* forthcoming)
Graeme Waples (*pro hac vice* forthcoming)
**BAKER BOTTS, L.L.P.**
30 Rockefeller Plaza
New York, NY 10112
(212) 408-2500
jim.beha@bakerbotts.com
eric.dupont@BakerBotts.com

38

christina.romak@bakerbotts.com
graeme.waples@bakerbotts.com

**ATTORNEYS FOR PLAINTIFF
OKLAHOMA GAS & ELECTRIC
COMPANY**